[Civ. No. 1767. Third Appellate District.—April 4, 1918.]

ADDIE HALLAWELL et al., Respondents, v. UNION OIL COMPANY OF CALIFORNIA (a Corporation), Appellant.

NEGLIGENCE — OIL COMPANY ENGAGED IN DISTILLATION OF ASPHALT—DISCHARGE OF GAS-STILL—CONTACT WITH FURNACE FIRES.—An oil company engaged in producing commercial asphaltum from crude petroleum, and incidentally to preserve such oils as might be condensed from gases in the process, is guilty of negligence where its master mechanic, in attempting to repair a gas-still, permitted the discharge of its highly inflammable fluid in such a way as to come in contact with furnace fires and to spread quickly to the immediate vicinity of an open trap, the surface of which carried more or less oil and inflammable material.

ID.—ACTION FOR DEATH—BURNING IN FIRE OF ASPHALT SHED—PROXIMATE CAUSE—PROOF.—In an action against an oil company engaged in the distillation of asphalt for death by fire of a carpenter employed in one of its sheds, the plaintiffs were not required to show with absolute certainty that the fire which originated at the asphalt-stills through the company's negligence was communicated to the shed and was the proximate cause of the death.

ID.—EXPERT OPINION—COMPETENT TESTIMONY.—In an action against an oil company engaged in the distillation of asphalt for the death

of a servant, by fire, the trial court properly allowed an expert witness to testify, in answer to hypothetical questions, as to the effect of burning oil at the intake of a six-inch pipe when only a small quantity of water was passing into the pipe, although there was testimony that when the asphalt-stills were in full operation, as at the time of the fire, a trench usually carried water from condensers sufficient to fill half the pipe at its intake.

ID.—EVIDENCE — BASIS OF HYPOTHETICAL QUESTION.—A hypothetical question must be based upon evidence, but the basis may consist of any condition of facts the evidence of which tends to establish the facts assumed, or which the jury may reasonably find to be proven.

ID.—RESULT OF EXPERIMENT—TESTIMONY OF BYSTANDER.—A bystander to an experiment, though not assisting in any way to make it, may testify as to its result if he had knowledge of all the conditions of the experiment, and it was one involving no special technical knowledge, or was such that its result could be seen and understood by a person of ordinary judgment.

ID.—EXCLUSION OF TESTIMONY OF BYSTANDER—ERROR WITHOUT PREJUDICE.—In such an action, the ruling of the trial court denying defendant the right to show by a bystander the result of an experiment was not error where the tendency of the experiment was to prove a fact not disputed.

APPEAL from a judgment of the Superior Court of Contra Costa County, and from an order denying a new trial. R. H. Latimer and A. B. McKenzie, Judges.

The facts are stated in the opinion of the court.

Chickering & Gregory, Evan Williams, Frank H. Gould, B. V. Sargent, and J. E. Rodgers, for Appellant.

Stetson & Koford, A. T. Shine, Elmer E. Nichols, and T. D. Johnston, for Respondents.

CHIPMAN, P. J.—Plaintiffs bring the action as heirs at law of Charles Hallawell, deceased, who, it is alleged, lost his life on December 9, 1913, at Oleum, Contra Costa County, through the alleged negligence of defendant. The cause was tried before a jury and plaintiffs had the verdict. Judgment was entered thereon, from which and from the order denying its motion for a new trial defendant appeals.

We have prepared the following rough diagram taken from data furnished by two exhibits found in the record:

This seemed necessary to a fair comprehension of the evidence in the case. The main object of defendant's plant was to produce commercial asphaltum from crude petroleum and incidentally to preserve such oils as might be condensed from gases in the process.

The battery of asphaltum-stills consisted of ten separate stills, to each of which was attached a condenser. A furnace commencing at still number 10 at the north end of the battery ran under all the stills to still number 1. Still 10 was connected with still 9 and still 9 with still 8, and so on to still 1. East of the stills some distance was the gas-receiver, noted on the diagram, into which gases that did not condense were carried from the condensers and thence by a pipe these gases were conveyed to the gas-seal situated near the northwest corner of the stills, and the inflammable gas was taken by a pipe from the gas-seal to the furnace under the stills and burned. A ditch ran along on the west side of the stills into which the waste water from the condensers ran and was brought to a point near still number 7, where this overflow was taken up by a six-inch pipe and carried about eighteen feet at a grade of .32 in that distance to the open trap noted on the diagram. At the lower or west side of this trap, which latter was flush with the surface of the ground and was about eighteen inches square, was an eight-inch pipe so set in the trap as to carry away the contents of the trap but leaving the discharge of the six-inch pipe slightly below the surface of the water. About four or five feet west of the trap this eight-inch pipe made a right angle down about six feet and resumed its course west for about sixty feet and at about the same grade at the six-inch pipe, where it discharged in a wooden ditch in front, on the east side of the group of sixteen asphalt kettles. Between the trap and the drop in the eight-inch pipe was a valve intended to shut off the flow through that pipe. Immediately west of this row of asphalt kettles and connected with them was a two-story wooden building of dimensions 130 feet by 150 feet. The asphalt, after cooling, was here drawn into barrels through long spouts leading from the kettles and stored on the first-story floor of this building, and was shipped from the platform on the west side of the building. This lower story was entirely open on all sides, the upper story, ten feet above, being supported by the necessary timbers. The

upper story consisted of a workshop of one large room and was used for cooperage purposes and storing barrels and barrel materials. At the points indicated about one hundred feet from the west side, two narrow stairways led to the lower story. The supporting timbers and the sides of the upper story and the roof were covered with corrugated iron. The east side of this upper floor was entirely occupied from floor to roof with barrels. There were no openings on the north or south side, but on the west side there was a number of windows with a ten-foot drop to the platform below. The upper floor was filled with barrels, work-benches, and materials of various kinds, with narrow passageways at intervals leading to the west side which were at times more or less obstructed by loose materials.

There was a fire levee, noted on the diagram, to check the contents of any of the stills, should one explode, from running down to the kettles.

When the plant was in operation, crude oil was placed in still 10, the heat increasing in intensity as the asphaltum residuum passed from still to still, until at still 1 it was as high as seven hundred degrees Fahrenheit, the asphaltum residuum in the process of refinement becoming of greater viscosity as it passed through the stills until the condensation of the gases in the condensers had reached its maximum. The surplus or remaining noncondensable gases passed from the various condensers to the gas-receiver and thence as shown to the gas-seal, more or less impregnated with oil which had not been condensed. The finished product was drawn from still 1 to the asphaltum kettles to cool preparatory to being drawn into barrels and stored or shipped. It was found necessary in the last operation to heat the cooled asphaltum in order to draw it off into the barrels, and this was done by using plates of iron on which was burning crude oil and asphaltum placed under the spouts leading from the kettles and these portable heating appliances were wheeled on iron barrows from place to place and fuel dipped from containers to feed the fires, which latter flamed up at times several feet. The effect of these fires was to give off a dense smoke which settled on all parts of the building more or less and particularly on the timbers supporting the upper story and upon the sides and parts of the building immediately exposed to the smoke arising from these fires. This

soot was inflammable and burned with rapidity when exposed to sufficient heat to start it burning. The floor of the shed was wooden and was usually kept covered with sand. When the sand had become too much impregnated with asphalt in wheeling leaky barrels over the floor it would be removed and fresh sand put on the floor. It appeared, also, that in wheeling the containers of the oil used as fuel to heat the spouts, oil was spilled on the ground around the asphalt stills.

Prior to the burning of the cooling shed, defendant had commenced to install an improved method of heating the spouts of the asphaltum kettles by substituting steam-pipes, thus avoiding the accumulation of soot on the building, but it had not progressed beyond about one-third or one-half of the building. On the day of the fire there had been no heating of these spouts and there was no fire burning at or near these kettles.

The ground in front of the stills was nearly level, but sloped slightly to the open trap from the gas-seal, which latter contained a quantity of oil in the nature of gasoline condensed from the gases coming from the gas reservoir. This seal was of about fifty or sixty gallons' capacity.

We come now to inquire into the cause of the accident. The eye-witnesses who testified were in defendant's employment at the time and were so employed at the trial. Decedent Hallawell was burned to death on the second floor of the asphalt-shed in the early afternoon of December 9, 1913, and at the time was working with one Graves, another carpenter, who also perished in the fire, and with one Hanford, the carpenter foreman, who survived.

It appeared that master mechanic Lightbody was called to repair a leak in the gas-seal. Without knowing or inquiring into the contents of the seal, and assuming that it was water, he caused to be turned down a stand-pipe parallel with the ground, which came from the bottom of the seal upward along its side, thus causing the entire contents to run over the ground around and near the trap and into the trench at the furnaces. He turned away, but soon discovered that the oil and gases coming from the seal had taken fire from the furnaces and the fire was communicated to the oil spread over the ground and was burning briskly over an area of twenty feet square and within three or four feet of the trap. A strong wind was blowing from the southeast toward the

asphalt-shed and across the trap. The burning material was noticed close to the intake of the six-inch pipe. Fire-extinguishers were procured and the fire burning in front of the stills and around the trap was put out. Witness Conley testified that to prevent the fire from passing through the eight-inch pipe to the asphaltum-shed he went to the gauge and turned it off and while doing this he said the smoke was rising and fire blazing up at the asphaltum-shed at about the point where the eight-inch pipe discharged at the shed. He testified: ''I couldn't say how long after I first saw the fire at the asphalt-stills before the whole building was ablaze or aflame, about three or four minutes or so.'' An effort was made to extinguish this fire, but it spread so rapidly that in a very short time the entire building was enveloped in flames and a dense smoke from the burning soot which had accumulated on the building. The flames were seen to run. rapidly up the timbers supporting the second story and spread along the sides of the building. Of the situation in the second story, witness Hanford, under whom decedent and Graves were working, testified: ''We were bolting a barrel machine to a sort of frame while Mr. Hallawell was sawing some boards for the upper part of the crate when I noticed the smoke. I first thought it was the engine outside; lots of times the smoke will come up between the first and second floors. Shortly someone hollered 'Fire!' and we started for the stairs, that is, one of the stairs we came up. We all three of us started for the stairs, Mr. Hallawell, being nearest to the stairs, started out ahead and Mr. Graves, and I was on one side of the machine and he was on the other and he started right after Mr. Hallawell, and I had to run around the machine and was behind them, and I saw the smoke belching up through the stairs and I knew it was impossible for us to get down the stairs. I said, 'Run for your life, boys,' and I turned and ran in the opposite direction, and I supposed that they followed, but that is the last I ever saw of them. . . . I had some trouble with smoke as I was running to the front door, that is the west end of the building, the building was filling with smoke so fast that it was lowering and I had to get down on my knees to get to the door, in order to see my way out. There were several coopers making barrels that were working on that floor at the time. They were working at those different benches. These

other two men were working right with me. We were all three working on the same machinery. A minute or two, something like that, elapsed from the time I heard the cry of 'Fire!' until I told the men to run for their lives. I just started for the stairs and I saw we couldn't get down. I must have gone, I should judge, ten or fifteen feet toward the stairway. . . . I do not know of my own knowledge where that fire came from. I know the direction it came from. The first I saw of it was the smoke coming up through the building, from the east side; that is the side away from the bay. That place is right on the edge of the bay. The bay is on the west side and also on the north side of it; that portion of the works of the Union Oil Company is on sloping land toward the bay.''

The charred remains of Hallawell and Graves were later found in the ruins not far from the northwest corner of the building, in which direction they probably attempted to escape. Witness Lightbody testified: ''When I saw the fire down below, when my attention was called to it as I was leaving there (near the fire at the stills), a great deal of smoke was breaking out, the building was not entirely enveloped, the rear end of it (at the kettles) was almost entirely so that you could not see it hardly. It was completely enveloped in flames so quickly that I could not hardly tell you. It was not more than two or three minutes and the flames had made some headway by that time.''

Witness Curran testified that after putting out the fire at the stills ''we turned around and noticed that the shed was burning below us. . . . The flame traveled very fast. . . . It was just instantly after I succeeded in putting the fire out there (at the stills) that I observed the fire in front of kettle No. 7; it was just a moment. . . . I don't know if it was soot; it was some black substance on the posts; they were covered with sheet iron. . . . Q. Did you see the fire go up that? A. I saw it travel along it, yes, sir. Q. And how fast did it travel along there? A. I do not know, I am not sure, it traveled pretty fast. . . . I should judge it was four or five minutes, three minutes maybe, after I first saw the fire, the part in front of the kettles, before the whole building was in flames. It wasn't very long; it burned fast.''

Witness Del Monte testified that after putting down his extinguisher with which he had been fighting the fire around

the trap he noticed that the shed was on fire. ''After I saw the fire it was a minute or a couple of minutes, probably a minute and a half, before the whole building was in flames.''

There was no material conflict in the testimony as to the cause of the fire in front of the stills and around the open trap. To effect the repair of the gas-seal it was not necessary but was, we think, negligence to discharge its highly inflammable fluid, as was done, in a way to come in contact with the intense furnace fires and in a way to spread, as it did quickly, to the immediate vicinity of the open trap, the surface of which carried more or less oil and inflammable material. From the evidence in the case the plaintiffs advanced the theory that the burning fluid was carried through the six-inch pipe to the open trap and thence by the eight-inch pipe to the asphalt-shed; or the oil on the surface of the water in the trap was ignited by the heat from the fluid burning on the ground near by, or by the flames being wafted or carried directly to the trap by the high wind and thence passed down the eight-inch pipe, before the valve was shut off, thus igniting the inflammable material at the asphalt-shed. The expert testimony was that fire would travel with great rapidity in passing over the surface of the water—like a train of powder. Defendant offered no explanation, but contented itself with combating the theory of plaintiffs. Expert testimony was admitted which showed that notwithstanding the outlet of the six-inch pipe in the trap was slightly below the surface of the water in the trap, the burning fluid passing through the pipe would cause an explosion which would force the fire to the surface at the trap, ignite the oil in the trap, and pass on down the eight-inch pipe. It was shown that ordinarily, when the stills were in operation, the overflow coming from the condensers and passing along the trench to this six-inch pipe would fill the pipe about half full at the intake and, its grade considered, the pipe would be full for a distance of about seven feet back from the outlet at the trap, and, in the opinion of the witness, an explosion would not force the burning fluid through this obstruction. It was also shown that this ditch did not always carry the water freely, but at times was more or less clogged. In the confusion of the moment no witness was able to say just what the condition was at the time, nor did anyone testify that he saw the fluid burning at the intake. It was

seen, however, quite near to it.   No one testified that he saw
the fluid burning in the trap or enter the eight-inch pipe
in a burning condition, or escape at the asphaltum-shed
in that condition.   There was no fire at the shed and had
not been on that day, and no cause is suggested for the fire
which consumed the shed other than the fire which started
at the gas-seal.   About the time the fire around the trap was
extinguished, which was the work of but a short time, one
of the men, as we have seen, went immediately to the valve
and turned it off, but the fire had in some way already
reached the shed, as described by the witnesses, and was
flaming up.

We do not think plaintiffs were required to show with abso-
lute certainty that the fire which originated at the stills
through what we regard as an act of negligence on defend-
ant's part (*The Santa Rita,* 176 Fed. 890, [30 L. R. A.
(N. S.) 1210, 100 C. C. A. 360]), was communicated to the
asphalt-shed and was the proximate cause of the death of
these two men.   The evidence that this fire ran through the
six-inch pipe to the open trap may not be conclusive.   The
evidence, however, that the burning oil was in close proxim-
ity to the trap; that its smoke and flame noticeably rose two
or three feet from the ground; that this smoke, as was
shown, would naturally contain more or less inflammable
gases which might readily be communicated to the  gases
rising from the trap or the oil on it by the eddying currents
of the strong wind then blowing; that the fire burst forth
almost simultaneously at the shed where there had been no
fire from any other source and before the valve on the eight-
inch pipe was turned off—these circumstances constituted a
reasonable hypothesis for the explanation that the oil on the
surface at the trap took fire and was carried down the eight-
inch pipe, at the foot of which it was first seen at the shed
by witnesses in the shed and at the stills.

Respondents contend that having shown the circumstances
surrounding the fire sufficient appears to justify the invoca-
tion of the *res ipsa loquitur* doctrine, and that in the absence
of explanation by the defendant, the circumstances afford
reasonable evidence that the accident arose from want of
care.   (*Judson* v. *Giant Powder Co.,* 107 Cal. 549, [48 Am.
St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020] ; *O'Connor* v.
*Mennie,* 169 Cal. 217, [146 Pac. 674] ; *Van Horn* v. *Pacific*

*Refining etc. Co.*, 27 Cal. App. 105, [148 Pac. 951], and other cases cited.)   We think this doctrine may be urged with more than plausibility.   Everything in the present case which in any way contributed to the accident was under the management of the defendant; the thing which caused the injury was shown to have been under the management of defendant, and that in the ordinary course of things the accident would not have happened if those having the management had used proper care.   We do not, however, find it necessary to resort to this doctrine to find support of the verdict.

We are satisfied from the evidence that the deceased was not furnished a safe place in which to work.   Whatever the cause of the fire at the shed, whether it originated at the gas-seal or by some unknown cause at the shed itself, deceased lost his life through conditions which defendant allowed to exist and which by ordinary care could have been avoided. It is beyond dispute that the rapidity with which the fire spread over the building was caused by the oil-impregnated soot which had been allowed to accumulate on the timbers and sides of the building, which with ordinary care could have been kept free from this danger.   Considering the purposes for which the upper story was used and its crowded condition with barrels and materials of all kinds and the meager means of escape afforded, deceased and his companion were in a veritable trap when the flames and smoke burst upon them almost at the first cry of fire.   Contributory negligence cannot be imputed to deceased, for the instinct of self-preservation would have impelled him to seek safety with all possible promptness, and that he was caught while fleeing from the danger is shown by the discovery of his remains some distance from where he was when Hanford cried out, "Run, boys, for your life!"

Error is assigned in permitting plaintiff's expert witness, Cooper, to answer certain hypothetical questions.   Appellant assumes it to be conclusively shown that the only way the fire in front of the stills could have been communicated to the asphalt-shed was through the trap; that the possibility of the fire having reached the trap along the surface of the ground was by the testimony eliminated.   Hence, if the fire reached the trap at all, it was through the six-inch pipe. Attention is then called to the testimony that when the stills

were in full operation, as they were at the time of the fire, the trench usually carried water from the condensers sufficient to half fill the six-inch pipe at its intake; that the grade of this pipe was .32 of a foot in eighteen feet and that the top of this pipe at the trap was one and three-fourths inches under the surface of the water in the trap; that expert Cooper had testified that under these conditions the pipe would be full for six or seven feet back from the trap, and that it was improbable that the fire would penetrate this obstruction and set fire to the oil in the trap. As already noted, there was evidence that the trench in front of the stills was occasionally clogged by sticks and debris, thus obstructing the flow of water to the six-inch pipe intake and diminishing or wholly shutting off the water for the moment. Expert Cooper was asked the following question: "Now, answer my question: what would be the condition that prevailed there if there was less water flowing into the intake pipe, of everything shown on that—that is, less than the usual flow of water?" Having in mind that the oil which ran out of the seal into the ditch and over the ground around the trap was carried on top of the water in the ditch, where it was quickly ignited by the fire from the furnaces and was seen in this condition passing still number 8 and in the immediate vicinity of the intake of the six-inch pipe, witness Cooper testified: "Suppose there is a small quantity in the ditch or enough water only to carry the oil down, the water would carry the oil down in front of the stills. That wasn't the question. The oil was spilled on the water and then became lit. In the first place, the water would carry the oil down to the mouth of the six-inch pipe, and then, of course, when it got to the mouth of the six-inch pipe, it would run into the six-inch pipe. Now, then, if the oil were ignited at any time between the mouth of the six-inch pipe and where it was spilled, the flame would travel down the oil, as it does when inflamed oil is put on water, and it would also travel down this pipe, through this opening and through the trap and down the eight-inch pipe and down to the end, it would carry it like a shot out of a gun." He then explained how an explosion would follow when a match is touched to a mixture of gasoline and air or inflammable gas and air and why an explosion would follow if the oil was ignited after some of the oil had floated into the six-inch pipe—"there

would be a mixture of the vapor of oil and of air in the six-inch pipe and if the oil was ignited, if the ignited oil flowed down to the mouth of the six-inch pipe, it might possibly cause an explosion of the gases contained in this pipe, I would say it will cause an explosion of the gases contained in the pipe,'' the effect of which he explained would be to force the flame to ''shoot out into the trap,'' although at the outlet the water might be over the top of the pipe—how much over he could not say. He stated, however, that ''when the pipe is full of water up to this point [indicating on the diagram] the burning oil flowing on the ditch will just collect on top of the water above the pipe, and, as burning oil cannot sink under the surface of the water, will stay in the ditch and nothing would happen. The fire would be confined in the ditch in front of the stills, providing this pipe is full of water.'' He explained, further: ''If the liquid which has had the flame on it in the ditch runs through the six-inch pipe but the flame is extinguished, the water will run through the trap as usual, but in addition to that, the oil from which the flame came, but which has not been extinguished, will pass along through the water and will pass out under the top end of the six-inch pipe and will flow from the trap. The material that floats on top is the oil which has been put out. Of course, it is inflammable when it is there. It would exhale inflammable gases for this reason, that when oil is burning on the top of water, especially a large quantity of oil, enough to make a flame, that if that flame has been on it, that flame will make water very, very hot, in some cases will make the surface of the water boil, therefore the water in this trap will be very much hotter, if there has been extensive fire in this ditch, than before, and if the water is hot in the trap, it will tend to volatilize the oil in this trap, so this trap, in addition to the oil on it, should have some inflammable vapors over the surface of the oil also.'' This condition of things would, he testified, cause inflammable vapors to come off the top of the water in the trap.

Appellant is not justified in its assumption that the testimony eliminated the possibility of the oil in the fire-trap having taken fire from the burning oil around it that came from the gas-seal and that if the fire at the kettles came from the fire in the trench, it must have been there by passing through the six-inch pipe. There was sufficient evidence to

support a finding by the jury that the oil in the fire-trap was ignited by the burning oil surrounding it and thence ran down the eight-inch pipe. This fire-trap was open at the top and was flush with the surface of the surrounding ground. The oil on its surface and the vapor arising from it were thus exposed to the fire. Witness Conley testified that when the fire started, he blew the whistle and immediately turned off the water from the condensers, which, of course, stopped the flow into the trench and would diminish the quantity running into the six-inch pipe. The rule undoubtedly is that a hypothetical question must be based upon evidence, but the basis may consist of any condition of facts the evidence of which tends to establish the facts assumed, or which the jury may reasonably find to be proven. In practice the trial court is charged with much discretion, and the court may properly allow the question under the claim of counsel that the facts stated have been proven rather than taking the risk of passing upon a question of fact by denying the offer on the ground that there is no evidence of the facts or a particular fact embodied in the question. Counsel objecting may have the instruction of the court to the jury to disregard the testimony of the expert unless satisfied that all the facts upon which the question is based are true. (*Estate of Dolbeer*, 149 Cal. 227, 252, [9 Ann. Cas. 795, 86 Pac. 695].)

We think, however, that under all the facts and circumstances the court properly allowed the witness to testify as to the effect of the burning oil at the intake of the six-inch pipe when only a small quantity of water was passing into the pipe. But, if we are mistaken in this view, we cannot see that defendant was seriously prejudiced thereby when we consider that the fire at the kettle shed can be accounted for by disregarding all evidence as to the six-inch pipe conveying the fire, and especially where, disregarding the origin of the fire, the jury were justified in finding that Hallawell lost his life because not given a safe place in which to work.

It appeared that Mr. Nichols, one of plaintiff's attorneys, made an experiment by passing a bag over the intake of the six-inch pipe, but he did not testify in the case. Witness Conley was called by defendant to prove that he was present and saw what Mr. Nichols did. "Q. Did you or did you not see anybody day before yesterday do anything to that portion of the six-inch pipe, shown upon the map No. 2 which

connects with the ditch in front of the stills?'' Objection by plaintiffs was made to the question. Some argument ensued as to the admissibility of the question, in the course of which the court said: ''He can testify of his own knowledge what was done there himself; he needn't refer to Mr. Nichols at all; he can testify as to the water he saw in the pipe, that the water was stopped, and that he knew it was stopped, and that he knew all the conditions, if he is prepared to testify to the facts, let him testify himself.'' The question above shown was then asked. ''The court: This witness can testify as to any fact within his own knowledge as to conditions that existed there.'' The question was not objectionable, but an answer to it would have proved nothing more than that he saw somebody do something to the six-inch pipe. Defendant did not follow it up by endeavoring to elicit from the witness what he himself observed. We think a bystander to an experiment being made, though he is not assisting in any way to make the experiment, may testify as to the result if he had knowledge of all the conditions entering into the experiment and it was such a one as involved no special technical knowledge and was such an experiment as that the result could be seen and understood by a person of ordinary judgment. Defendant, however, seems not to have asked any question, which fairly shows that the court refused defendant the privilege of proving the result of Mr. Nichols' experiment. Furthermore, as we understand defendant's purpose, it was to show that when no water was flowing into the six-inch pipe, the top of the pipe at its outlet was still under water. This fact, as we read the evidence, was not disputed. Hence, no error was committed even if the ruling of the court had the effect to deny defendant's right to show by Conley what he observed.

The judgment and the order appealed from are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 3, 1918.