[Civ. No. 3124. Third Appellate District.—January 26, 1927.]·

## PHOENIX ASSURANCE COMPANY, LIMITED, OF LONDON (a Corporation) et al., Respondents, v. TEXAS HOLDING COMPANY (an Unincorporated Association),. Appellant.

[1] NEGLIGENCE — EXPLOSION OF OIL TANKS — DESTRUCTION OF MOTOR TRUCKS BY FIRE—EVIDENCE—FINDINGS.—In an action for damages by an insurance company upon an assigned claim after payment of policy covering loss of motor-trucks by fire, which originated from an explosion of oil tanks on defendant's property, the evidence was sufficient to show that the explosion was caused by gas propelled along the ground from the tanks to a near-by furnace maintained by defendant, and to support a finding of negligence by defendant in the manner of maintaining the tanks and furnace.

[2] ID.—EXPLOSIVES—OIL STORAGE TANKS—EVIDENCE.—It is a matter of common knowledge that oil storage tanks do not ordinarily explode or ignite in the absence of some negligent act or omission on the part of those in charge of their operation and maintenance.

[3] ID.—CARE—EVIDENCE—EXPERTS—FINDINGS.—In an action for damages growing out of the alleged negligence of defendant in maintaining an open furnace in proximity to oil storage tanks, it is not necessary that there should be testimony as to what would have been proper care under the circumstances, as the ultimate fact of negligence is for the jury and its finding as to defendant's negligence was amply supported by the evidence, without the aid of either expert or opinion testimony.

[4] ID.—CUSTOM—USAGE—EVIDENCE.—In such action, the trial court did not err in excluding testimony as to the character of the tanks and appliances used by others in the same locality, where defendant was permitted to show what was considered among oil men good and safe practice and to introduce evidence to show whether or not the proper implements, including oil tanks upon defendant's property, comported with such practice.

[5] ID.—ORDINARY CARE—EVIDENCE.—The term "ordinary care" is a relative one and the standard by which it is to be measured varies with the circumstances attending each particular case.

[6] ID.—CARE—CUSTOM—USAGE—EVIDENCE.—Mere custom or usage cannot make due care out of conduct that is, in fact, negligent, under the circumstances disclosed by the evidence.

5. See 19 Cal. Jur. 579; 20 R. C. L. 24.
6. See 19 Cal. Jur. 581; 20 R. C. L. 27.

[7] Id. — Assumption of Risk — Contracts — Custom — Evidence. — Where no contractual relations exist and there is no assumption of risk, the specific practice of others cannot be admitted in testimony as an excuse for the alleged negligent act of the defendant.

[8] Appeal—Instructions—Briefs.—It is not incumbent on the appellate court to discuss alleged errors in instructions not considered worthy of discussion by appellant.

---

(1) 25 C. J., p. 209, n. 98.    (2) 23 C. J., p. 144, n. 30.    (3) 25 C. J., p. 209, n. 3, p. 210, n. 9.    (4) 25 C. J., p. 206, n. 41.    (5) 29 Cyc., p. 428, n. 75.    (6) 29 Cyc., p. 435, n. 42.    (7) 29 Cyc., p. 609, n. 15.    (8) 4 C. J., p. 1073, n. 43.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles S. Burnell, Judge. Affirmed.

The facts are stated in the opinion of the court.

Oliver O. Clark, Charles R. Nelson and Dan V. Noland for Appellant.

Newlin & Ashburn, R. L. Haight and W. C. Mathes for Respondents.

PLUMMER, J.—The period given for the filing of additional briefs herein having expired and no additional briefs having been filed, it is assumed that the parties have elected to stand upon the briefs already on file.

During all the times mentioned herein, the defendant was in possession of and operating certain oil property situate at Huntington Beach, in the county of Orange. This property was located on Crystal Street between Summit and Garfield Streets. On the property was an oil well and certain tanks for the reception and storage of crude petroleum. For some time prior to the twenty-fourth day of February, 1923, the defendant had been producing crude petroleum and storing the same in the tanks just mentioned. These tanks were located in close proximity to Crystal Street. Crystal Street was a much-traveled public highway. On the twenty-fourth day of February, 1923, an explosion occurred on the premises occupied by the defendant and burning oil from

---

8. See 2 Cal. Jur. 727; 2 R. C. L. 178.

the tanks referred to was thrown over and upon Crystal Street and over and upon three automobile trucks, then and there being, belonging to the copartnership of Shaffer & Best, and destroying said trucks by fire. This action is for the value of said trucks. The insurance company paid the insurance policies on the trucks in question and took an assignment of the right of action against the defendant herein. Judgment was awarded plaintiffs and the defendant appeals.

The action is based upon the alleged negligent manner in which the defendant maintained its oil tanks and conducted its oil-producing operations. As stated, the oil tanks were maintained in close proximity to the public highway known as Crystal Street. The evidence set forth in the transcript shows that manholes, or openings, were maintained in the tanks and that a boiler used in the operation of its pumping machinery was located approximately thirty feet from the nearest oil tank; that this boiler was so erected that the fires maintained thereunder would flash up along the rear end of said boiler from two to six feet.

The appellant alleges four grounds as reasons for reversal herein, to wit: Insufficiency of the evidence; erroneous rulings of the court in the rejection of evidence; erroneous instructions given to the jury and error in refusing instructions requested by the defendant. In support of the alleged insufficiency of the evidence, the appellant sets forth that there was an entire absence of any testimony showing that the tanks, appliances, equipment and other instrumentalities and methods of handling oil and gas by the defendant was negligent; that is, that no witness actually testified that the manner in which the defendant maintained its instrumentalities and conducted its business operations was negligent.

Before discussing this misconceived statement of what we think the law is, we will set forth the testimony bearing upon the issues involved. Before doing so, however, we will state that the testimony adduced was for the purpose of showing that crude oil, as taken from the wells and stored in tanks generates inflammable gases; that this gas in foggy weather will drop to the ground and move along the ground with the wind, if any is blowing, in the same direction with the wind; that at the time in question there was a rather brisk wind blowing from the direction in which the tanks

were situated toward the place where the furnace and boiler
herein mentioned were maintained and that this wind moved
the gases along from one of the tanks to the furnace where it
was ignited by the exposed blaze of the fire under the boiler.
With this in view, we will quote from the transcript, which
we think amply justifies the conclusion reached by the jury
and the trial court.

J. W. Hankins, a witness called for the plaintiffs, testified:
The storage tanks were located upon the property of the
Texas Holding Company; they were in the northeast corner
about four feet apart; the tanks were about six feet from
Crystal Street; the tanks were of about twelve hundred bar-
rels capacity; they were about fifteen feet tall and twelve
feet across.

H. G. Best, a witness called for the plaintiffs, testified as
to the location of the tanks and placed them at about six
or eight feet from the line of Crystal Street.

George Shaffer, a witness called for the plaintiffs, testified
as to the location of the tanks and as to the burning of
the trucks, locating the tanks about the same distance from
Crystal Street and the trucks in the street a short distance
from the tanks.

The witness Albert testified that there was heavy traffic
on Crystal Street. The witness Hankins further testified
that there was oil on fire in the tanks; that one of the tanks
was full when the fire started; that the south tank was
about two-thirds full; after the fire there was some oil left
in the tanks; after the fire there was nothing left of the
trucks, except junk, iron and ashes; that there was a man-
hole around the intake pipe of the tank; that they were not
covered.

Eugene A. Whitten, an expert witness, testified that crude
petroleum gives off gas shortly after being taken from the
well.

L. N. Shaffer, a witness called for the plaintiffs, testified
that the fire was burning in the open furnace about thirty
feet from the nearest uncovered storage tank; that he saw
fire burning in the vicinity of the tanks immediately be-
fore the explosion; that he saw the fire burning under
the boiler; it was coming out at the back end of the boiler.
The fire came out around the boiler and out of the back end
of it, as it was not bricked up over the back end. It was

open; an open-end boiler, so to speak; that there was a sump ten or fifteen feet distant.

The witness Ashburn testified that the boiler was not bricked up; it was what you would call a tubular boiler bricked up around the outer edge and half way up on the back was open; that the flames would jump up four to six feet out of the back of the boiler.

The witness Hankins further testified that he would approximate the distance between the furnace and the nearest tank at about thirty to forty feet; that the boiler was used for making steam and that the back end of the boiler was open; that every once in a while the flames would shoot up from two to six feet high.

The witness Height testified that the fire was coming out of the back of the boiler and going approximately three or four feet high.

The witness Best testified that there was a fire under the boiler at the time of the explosion and also as to the fire blowing out the end of the boiler.

The witness Hankins, on cross-examination, testified that gas would travel with the wind, never against the wind; that there was a good stiff breeze at the time of the explosion; that the wind was blowing directly from the south; that oil freshly produced gives off gas.

W. T. Wallace, a witness called for the plaintiffs, testified that he noticed the direction in which the wind was blowing at the time in question. It was from the southeast to the northwest; that the wind was blowing from eight to twelve miles per hour.

George Shaffer, a witness for the plaintiffs, testified that natural gas was permeating the atmosphere all around the premises in question; that there was some fog.

Eugene A. Whitten, an expert witness, further testified: That he had observed the effect of weather conditions upon gas that is given off from petroleum; that fog and night air will cause the gas to lie on the ground; that the gas tends to creep along the ground in the direction of the wind; damp air has the same effect; that the sump referred to had oil in it; that the gas would naturally go with the wind from the tanks toward the furnace; would naturally go right along with the wind. "I have seen gas travel along the ground as far as one hundred to one hundred and fifty

feet. The fog has a tendency to hold the gas closer to the ground. The wind blowing toward the north would mean that the gas would drift toward the furnace; when the explosion occurred the oil was thrown across the road over toward the east.''

Mr. Sistrunk, a witness called for the plaintiffs, testified that the trucks were on the street opposite the tanks; that the explosion seemed to be right in among the tanks; ''it just seemed to be in under the tanks; that is, where I was the flash and the explosion I heard came from that point.''

The witness L. N. Shaffer testified there was just a flash and the fire and then there was an explosion and the fire and oil came right across the road, blew onto the trucks across the road. ''The first I saw was a flash of fire. It seemed to be right in between the tanks. It just seemed to come up all around them.''

The witness Hankins further testified: ''I was sitting there looking toward the trucks and all at once saw a puff of smoke and flash come up from the tanks. When I first saw the flame it was between the tanks; we had been checking up the drill stem; there was a great light and right in about a second or so I heard the explosion; there was a flash followed by an explosion and fire.''

Other witnesses testified as to the burning oil being thrown from the tanks across the road and over upon the trucks and that the trucks were burned by the burning oil.

[1] This testimony shows the circumstances and conditions upon which the jury based its conclusions as to the origin of the explosion, and seems to us to lead irresistibly to the conclusion that the explosion was occasioned by the gas being propelled along the ground over the intervening space between the tanks and the open end of the furnace and there ignited by the exposed flames. The commonly known fact that gas is inflammable and explosive required no testimony. It is true that the transcript discloses no testimony that anybody actually saw the flaming gas run from the furnace to the tanks, but the distance was so short that there could be only, as the witnesses describe, a flash preceding the explosion. To hold in this case that the evidence is insufficient to support the conclusion that the fire and explosion occurred by the creeping gas being ignited by the exposed flame, we would have to hold that, as a

matter of law, no jury could reasonably have found that the origin of the explosion was in the ignition of the creeping gas; also, we would have to hold that no jury could reasonably find that it was negligence to maintain a fire where the flames were exposed within such proximity to oil tanks, from which gases were being given off. In so far as our attention has been called to the testimony, it is uncontradicted that fresh oil discharges gases which are inflammable. Instead of being insufficient to support the conclusion as to the origin of the explosion and fire, we think the only reasonable inference to be drawn from the surrounding circumstances is that the explosion and fire came about just as detailed by these witnesses, and that it came about by the exposure of the flames of the fire maintained under the boiler. We also think it is beyond question that the jury had a right to draw the inference of negligence from the maintenance of an exposed fire in close proximity to oil tanks discharging gases, and that it had a right to conclude that, under the circumstances, it was only a matter of time when the prevailing winds would come from the right direction to propel the gas of the tanks to the exposed flames and lead to the results described herein. The explosion and fire which caused the damage occurred on premises under the exclusive control and management of the defendant. [2] It seems to be conceded also as a matter of common knowledge that oil storage tanks do not ordinarily explode or ignite in the absence of some negligent act or omission on the part of those in charge of the operation and maintenance of such tanks. As said in *Judson* v. *Giant Powder Co.*, 107 Cal. 549 [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020], ''the real cause of the explosion and fire being unexplained, it is probable that it was occasioned by a lack of proper care,'' and, further, ''when a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care.'' As stated by this court in *Hallawell* v. *Union Oil Co.*, 36 Cal. App. 672 [173 Pac. 177], ''we do not think plaintiffs were required to show with absolute certainty that the fire which originated at the stills through

what we regard as an act of negligence on defendant's part, was communicated to the asphalt-shed and was the proximate cause of the death of these two men.'' The evidence in that case simply showed the circumstances by which inflammable gases rising from the oil were carried along by the air currents of the strong wind then blowing. And further on, in describing inferences that may be drawn from the circumstances, the court in that case said: ''Respondents contend that having shown the circumstances surrounding the fire sufficient appears to justify the invocation of the *res ipsa loquitur* doctrine, and that in the absence of explanation by the defendant, the circumstances afford reasonable evidence that the accident arose from want of care,'' citing *Judson* v. *Giant Powder Co.,* 107 Cal. 549 [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020]; *O'Connor* v. *Mennie,* 169 Cal. 217 [146 Pac. 674]; *Van Horn* v. *Pacific Refining etc. Co.,* 27 Cal. App. 105 [148 Pac. 951]. ''We think this doctrine may be urged with more than plausibility. Everything in the present case which in any way contributed to the accident was under the management of the defendant; the thing which caused the injury was shown to have been under the management of the defendant, and that in the ordinary course of things the accident would not have happened if those having the management had used proper care.''

[3] Appellant also urges that there is no testimony showing what would have been proper care under the circumstances and, therefore, the jury was not authorized in coming to the conclusion that the defendant negligently maintained a fire in close proximity to the oil tanks. The answer to this contention is well set forth in plaintiffs' brief, which we will paraphrase: If such testimony is necessary, what function has the jury to perform? If the ultimate fact of negligence is for witnesses, why the necessity of a verdict by the jury? The circumstances being shown, the ultimate fact is for the jury and for the jury exclusively in these matters. The law is thus stated in *Redfield* v. *Oakland C. S. Ry. Co.,* 112 Cal. 220 [43 Pac. 1117]: ''All the circumstances from which the ultimate fact of negligence upon the one hand, or due care upon the other, must be found were established by unconflicting evidence, and such ultimate fact was a matter to be inferred by the jury from

the evidence.'' This case quotes from *Shafter* v. *Evans*, 53 Cal. 32, where it is said: ''The ultimate fact of negligence in such a case is not one to be established by the mere opinion of witnesses called to testify. The evidence of experts is not admissible. . . . ''In applying circumstantial evidence which does not go directly to the fact in issue, but to facts from which the fact in issue is to be inferred, the jury have two distinct duties to perform: First, to ascertain the truth of the fact to which the evidence goes, and thence to infer the truth of the fact in issue. When this experience is of such a nature that it may be presumed to be within the common experience of all men of common education moving in the ordinary walks of life, there is no room for the evidence of opinion; it is for the jury to draw the inference.'' And further on: ''If the circumstances out of which the negligence is said to arise have been established by proof, or can be shown, the ultimate fact of negligence is an inference to be drawn by the jury, and is not to be established by the opinions of others.'' As stated in respondents' brief: ''Surely, it was not necessary to inform the jury, through oil experts, of all possible consequences to be anticipated from the presence of exposed quantities of natural gas and oil in close proximity to an open fire.'' See, also, *Arnold* v. *California etc. Cement Co.*, 161 Cal. 522 [119 Pac. 913], and *Barboza* v. *Pacific Portland Cement Co.*, 162 Cal. 36 [120 Pac. 767]. As stated in *County of Alameda* v. *Tieslau*, 44 Cal. App. 332 [186 Pac. 398]: ''If a finding of fact is based upon a reasonable inference, it is not within the power of this court to set it aside any more than it is within its power to set aside any other finding supported by sufficient legal evidence. For a finding of fact based upon a reasonable inference drawn from facts proved with legal sufficiency is as much and as completely as is any other finding of fact a finding based upon good and sufficient evidence. It is the peculiar and exclusive province of the trial court or jury in the first instance to make such finding of fact, and it is the especial right of every litigant to have all facts so determined by court or jury, this court sitting only to review the findings and being empowered to set them aside as matter of law only when not sustained by adequate evidence,'' citing *Ryder* v. *Bamberger*, 172 Cal. 799 [158 Pac. 756].

Notwithstanding the fact that the reporter's transcript of the testimony in this case covers some eight hundred pages of typewritten matter, the appellant has not called our attention to any insufficiency of the evidence to support the verdict other than the mere statement that no witness testified before the jury that the appliances maintained and operated by the defendant were maintained and operated in a negligent manner. An examination of the testimony, however, brief excerpts of which we have set forth, sufficiently discloses the fact that the jury had ample information upon which to base its conclusion, without the aid of either expert or opinion testimony.

In support of appellant's allegations of the insufficiency of the testimony are cited the cases of *Webber* v. *Bank of Tracy,* 66 Cal. App. 29 [225 Pac. 41], *Marovich* v. *Central California T. Co.,* 191 Cal. 295 [216 Pac. 598], and *Perara* v. *Panama-Pacific International Exp. Co.,* 179 Cal. 63, 67, 68 [175 Pac. 454]. An analysis of these cases shows, however, that they are inapplicable. The case of *Webber* v. *Bank of Tracy, supra,* rests upon contract, where the relation of bailor and bailee existed. In that case it was held that the bank engaged in the business of maintaining safe deposit boxes was held to no higher degree of care than the fair average of those engaged in a like occupation, and as conducted by the average prudent man. The bank was not an insurer, and could not be held to any stricter accountability than that which was reasonably exercised by others engaged in the same occupation. It is there said: "The standard of ordinary care is established by competent testimony upon the custom and general usage of the business. Absolute protection against bank burglary, in small communities, is unattainable." The question really presented in the Webber case was as to the reasonable sufficiency of the safe deposit boxes, vaults, and building to safeguard the property of the plaintiff. It differs from the facts of the case at bar in that the question really presented here is, Was or was not the defendant maintaining and operating an obviously dangerous contrivance? In the one case the question of safe deposit boxes, vaults, and building maintained by other banks would indicate the standard of care ordinarily considered to be sufficient. In the case before us the circumstances are such as to call only for the exercise of

the common judgment of reasonable men as to whether an exposed and unguarded furnace, the flames from which from time to time, would leap from two to six feet in the air, distant some thirty feet from the oil tanks, exuding gases, was or was not a continuing menace to life and property and constituting self-evident facts, from which a jury could reasonably draw all proper conclusions. Likewise, in the Marovich case it was a question of whether certain additional appliances were reasonably necessary, in that case a rear-end mirror in a one-man car, not whether the appliances and equipment of the car were essentially hazardous or dangerous to life and property in and of themselves. In the Perara case the question involved was that of whether care in the guarding of jewelry, where the defendant occupied no position of liability or responsibility other than that imposed upon a bailee, and in that case we may here state that testimony as to the custom or manner in which jewelers protected their property was held to be inadmissible. Ordinary common knowledge would indicate that a jury need not be told that gas, when exposed to a flame of fire, will explode.

[4]   Appellant also relies upon certain alleged rulings of the trial court, excluding testimony as to the character of the tanks and appliances used by other people operating in the Huntington Beach oil field. We quote the questions and the rulings of the court: "(By counsel for the appellant) : Q. Now, these tanks that I have called your attention to were just the ordinary storage tanks that are used in the Huntington Beach field? A. Yes, sir. Q. There are hundreds of them all around there, isn't there? (Counsel for plaintiff) : We object to that as irrelevant and immaterial and not cross-examination. The Court: What is the purpose of that? Mr. Clark: Why, they are charging us with negligence. They have described the tanks. We want to find out if there was anything negligent about the kind of a tank we had. The Court: Well, I don't think it would affect your negligence if these tanks either were or were not the same kind of tanks that other people used. Objection sustained. Mr. Clark: And are there any other open boilers in that field that you know of? A. Yes. Mr. Ashburn: Move to strike out the answer. The Court: It will be stricken out. Q. (Mr. Clark) Well, was your description

that you gave a description particularly applying to the Texas Holding Company property or one that applied to the whole field? A. Not exactly, but there is other property—there were other leases just as bad as theirs. Mr. Ashburn: I move to strike out the statement about the other leases on the ground it is irrelevant and immaterial and not responsive. The Court: Yes, the latter part, 'there were other leases just as bad' will be stricken out as not responsive and a conclusion of the witness. Q. Have you seen the boilers on other leases in the Huntington field as they were used at and immediately prior to the fire? A. Oh, yes. Q. I wish you would describe the manner in which those boilers were placed upon the other leases that you have seen down there in the Huntington Beach field. Mr. Ashburn: Objected to as irrelevant and immaterial. The Court: Objection sustained. Q. Mr. Clark: Can you tell whether other oil storage tanks in the Huntington Beach oil field at and immediately prior to the fire were covered or open? Objected to. Objection sustained."

Other like questions were asked and objections thereto sustained by the court and the court then said: "Now, I am not precluding you by showing from this or any other witness properly qualified what was considered among oil men good and safe practice, and then from introducing evidence to show whether or not the proper implements, including tanks upon the lease of the defendant company, comported with such proper and good practice, but I don't think the kind of implements that somebody else was using has the slightest materiality. To illustrate: If, for instance, A is using implements that are improper and the use of which is negligence, the fact that B, C, D, E and F and the rest of the outfit are also using the same kind of implements does not make his negligence any the less. And, on the other hand, if he is using implements that are good practice to use and proper in the same trade or calling, then also the fact that others in the same trade or calling are using similar implements is immaterial."

In support of its contention that the ruling of the court in excluding the proffered testimony was erroneous, appellant cites the Webber case, where the relationship of master and servant existed, and contends that it should have been permitted to show the kind of tanks that others were

using in the same field and also the kind of boilers and furnaces being maintained and operated in said field. In the Webber case, as we have shown, contractual relations existed, and in other cases relied upon by appellant, where the relationship of master and servant was found to exist, there arose also the question of assumption of risk. In all such cases the master is held to furnish appliances reasonably safe and the servant to assume the risks incident to the employment, etc. It is evident that these cases have no application where such relationships do not exist, and where it is a matter or question of whether the defendant has been guilty of obvious negligence and not whether someone else is also likewise guilty.

As stated by respondent, the question specifically is: In an action for damages caused to the property of another by the alleged negligence of the defendant in the operation and maintenance of its premises, may the defendant, to rebut the charge of negligence and to show its freedom therefrom, introduce evidence of the practices of others of the vicinity who are engaged in similar operations? In answering this question, it is to be noted that the court did not prohibit the appellant from introducing testimony tending to show proper practice, but only excluding testimony as to practices of particular individuals conducting oil-producing operations. It is to be noted that there is a marked distinction between cases having to do with negligence where the relationship of master and servant is involved and, also, of cases where there exists contractual relations, and in cases like the one at bar, where there is no assumption of risk, no contractual relationship and only the application of the ordinary legal maxim, that all persons are in duty bound to so conduct their own business as not to injure the lives or property of others. The standard by which liability is to be measured in the latter case is that of ordinary care. **[5]** This term, "ordinary care," is a relative one and the standard by which it is to be measured varies with the circumstances attending each particular case. That which may be sufficient under one set of circumstances may be wholly inadequate under changed conditions. The care must be in proportion to the danger to be avoided and the consequences which may reasonably be anticipated as the result of the conduct, and the circumstances may be such that far greater

care is exacted from one party to an action than from the other. 19 California Jurisprudence, 579, section 24, and, as stated in the same volume, section 138, page 729: "In most cases the law has fixed no standard of care other than the general one that it must be such as a reasonably prudent man would exercise under the particular circumstances. Whether a party's conduct measures up to this standard presents a question of fact which ordinarily should be submitted to the jury under proper instructions as to the law. In determining this question the jury and not the witnesses should apply the standard; so it is improper for an expert to testify that *certain acts* do or do not amount to a want of ordinary care, or that certain defects could be discovered with reasonable diligence. However, if it appears from the undisputed facts, judged in the light of common knowledge and experience, that a party has not exercised such care as men of common prudence usually exercise in like positions, or that the necessity of doing a particular act is apparent, and the custom of performing such act under certain circumstances is universal and relied upon, negligence may be declared as a matter of law."

[6]   That a mere custom or usage cannot make due care out of conduct that is in fact negligence under the circumstances disclosed by the evidence has been stated a number of times by the courts of this state, as well as of other states. Likewise, that the standard of care required is not to be established by proof that others have been in the habit of acting in the same manner, and as cited with approval in the case of *Rudd* v. *Byrnes*, 156 Cal. 636 [20 Ann. Cas. 124, 26 L. R. A. (N. S.) 134, 105 Pac. 957], "not even a general custom can be deemed a relevant fact in an action for negligence respecting any non-contractual duty which is not performed under fixed conditions," and, as stated in a citation from Utah hereinafter set forth, "Local customs, when reasonable, uninterrupted, and uniform, in a locality or district, and not contrary to public policy, may affect the interpretation of contracts made in their locality, by raising a presumption that such contracts were made with respect to them; but such custom cannot change the law of negligence," and, further, as said in one of the Texas cases herein cited, "while it is true that an established custom may be looked to, in many cases, for the purpose of determining

what parties really intended by a given contract, and what acts in the performance of it will satisfy it, it may well be questioned whether in any case in which, in the absence of contract express or implied negligence as an element, is the foundation of a right, custom may be set up for the purpose of showing that negligence does or does not exist.''

[7] Without analyzing the various cases, it is sufficient to state that the following authorities all hold that where no contractual relations exist, and, further, where there is no assumption of risk, as is the case where the relation of master and servant is concerned, the specific practice of others cannot be admitted in testimony as an excuse for the alleged negligent act of the defendant. (*County of Alameda* v. *Tieslau,* 44 Cal. App. 332 [186 Pac. 398] ; *Bosqui* v. *Sutro Ry. Co.,* 131 Cal. 390 [63 Pac. 682] ; *Rudd* v. *Byrnes,* 156 Cal. 636 [20 Ann. Cas. 124, 26 L. R. A. (N. S.) 134, 105 Pac. 957] ; *Pulsifer* v. *Berry,* 87 Me. 405 [32 Atl. 986] ; *Jenkins* v. *Hooper Irr. Co.,* 13 Utah, 100 [44 Pac. 829] ; *Wright* v. *Boller et al.,* 42 Hun (N. Y.), 77 ; *Illwaco Ry. & Nav. Co.* v. *Hedrick,* 1 Wash. St. 446 [22 Am. St. Rep. 169, 25 Pac. 335] ; *Metzgar* v. *Chicago, M. & St. P. Ry. Co.,* 76 Iowa, 387 [14 Am. St. Rep. 224, 41 N. W. 49] ; *Gulf C. & Santa Fe Ry. Co.* v. *Evansich,* 61 Tex. 3 ; *Grand Trunk Ry. Co.* v. *Richardson,* 91 U. S. 454 [23 L. Ed. 356, see, also, Rose's U. S. Notes].)

The substance of the foregoing cases may be epitomized in the following quotation taken from one of them : ''It would seem that the question whether negligence exists must be determined by the facts in the very case in which the question arises.''

We might also call attention to the fact that the case of *Standard Oil Co.* v. *Swan,* 89 Tenn. 434 [10 L. R. A. 366, 15 S. W. 1068], relied upon by the appellant, does not support its contention. In that case it was held that the manner in which individual dealers in the vicinity store and handle gas and oil was inadmissible. The court did say that custom and usage of well-appointed and managed companies engaged in the business of storing oil would have been competent evidence on the question of negligence in the proper conduct of the business. This, of course, is simply *dicta.* No question there was raised as to what constitutes well-appointed and well-managed concerns. There

is no evidence in the case at bar as to well-appointed and managed concerns, although the court did offer to permit the appellant to introduce testimony along that line.

We are not called upon to state whether we agree or disagree with the court's statement in this particular from the fact that no testimony was offered under the permission granted by the trial court.

[8] Appellant assigns as error the giving by the court of instructions Nos. 1, 2, 8, 9, 12, 14, 15, and 17, but no reasons are set forth or authorities cited showing in what particular the giving of any of said instructions constituted error. Under such circumstances we do not think it incumbent upon the court to discuss alleged errors not considered worthy of discussion by appellant. We will state, however, that we have read the foregoing numbered instructions and do not find in them, or any of them, any errors prejudicial to the appellant.

The judgment of the trial court is affirmed.

Preston, J., *pro tem.,* and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 24, 1927.